# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| BRIAN LYNN CAPPS;<br>ALEX GUERRERO;<br>CHRISTOPHER GUTIERREZ<br>CHANDRADAT PERSAUD;<br>JESSIE RAMOS; MIGUEL<br>GALARZA; EUGENE HORTON;<br>LINDSEY KIBLER; and JAMES<br>LINDEMIER, on behalf of themselves<br>and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 5:24-cv-00455-OLG<br><br><br>**SECOND AMENDED**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| *Plaintiffs,*<br><br>vs.<br><br>UNITED SERVICES AUTOMOBILE<br>ASSOCIATION; USAA GENERAL<br>INDEMNITY COMPANY; USAA<br>CASUALTY INSURANCE COMPANY;<br>And GARRISON PROPERTY AND<br>CASUALTY INSURANCE COMPANY,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |  |

## SECOND AMENDED COMPLAINT

Plaintiffs Brian Lynn Capps, Alex Gerrero, Christopher Gutierrez, Chandradat Persaud,

Jessie Ramos, Miguel Galarza, Eugene Horton, Lindsey Kibler, and James Lindemier bring this

action on behalf of themselves, and all others similarly situated against United Services

Automobile Association ("USAA"); USAA General Indemnity Company ("USAA-GIC"); USAA

Casualty Insurance Company ("USAA-CIC"); and Garrison Property and Casualty Insurance

Company ("Garrison") (collectively "Defendants"). Plaintiffs allege the following based on personal knowledge, information and belief, and investigation of counsel.

## INTRODUCTION

1.      USAA advertises, promotes, and sells automobile, home, property, and other insurance products as exclusively available to those who qualify for "membership" in USAA through a direct or familial connection with the United States military or certain military-related government agencies. Upon proving a requisite military connection, USAA issues new customers a member number. So central is membership to USAA that its website prominently reads: "Member owned. Mission led. We're run by members, for members."[1] USAA aggressively promotes membership's importance and value, including, for example, through a recent national television advertising campaign featuring former NFL star Rob Gronkowski and other pervasive marketing prominently promoting that persons with military connections (including enlisted personnel and military family members) qualify for "membership" and the benefits thereof. National advertisements also promise and highlight that current USAA members can pass eligibility for "USAA Membership" to their children and grandchildren.

2.      But for nearly two-thirds of USAA's customers, membership is a false, unfair, and deceptive promise that USAA has systematically breached. In truth, USAA reserves real membership and its concomitant benefits exclusively for customers from the officer class (in particular, commissioned and senior non-commissioned officers, officer candidates, and their unmarried widows). USAA secretly relegates all other customers—in particular, enlisted personnel and military family members—to nominal or "fake" member status.

---

[1] https://www.usaa.com/membership/about?wa_ref=pub_global_membership (accessed July 22, 2024).

3.      Real USAA members enjoy very real financial benefits, including:

   a.   An annual allocation of USAA's accumulated earnings, which totaled $10,409,661,922 as of December 31, 2023, to each real member's subscriber account. USAA pays out the entire balance of a real member's subscriber account in cash six months after the real member terminates membership. Over the last two years, termination distributions to real members totaled $673 million; and

   b.   Annual distributions to each real member of what USAA terms its "excess" surplus (i.e., capital that is in excess of that required by regulators or to ensure USAA's financial stability). These annual distributions are paid either in cash or as a credit toward the member's insurance bill. Over the last two years, annual distributions (including the senior bonus provided to customers of over 40 years) to real members totaled $1.274 billion.

4.      Even though USAA secretly reserves membership to its officer class customers, USAA purports to qualify enlisted personnel and military family members for USAA membership. It also contractually promises them real membership in the policy form used in its most popular product (automobile insurance), issues them USAA member numbers, and consistently refers to them in direct and general communications as USAA members. Through these and similar unfair and deceptive tactics, enlisted personnel and military family members have been led to believe they are USAA members, not second-class customers.

5.      In its advertising and general and direct communications, USAA assures enlisted personnel and military family members they are USAA members while withholding information about their non-member status and actively misleading them to think they are USAA members with the same rights and privileges as real USAA members.

6.      To further this scheme and create the illusion of membership for all customers, USAA interacts with both real and nominal USAA members through the same advertising, online, telephonic, and mail channels, all of which are branded with USAA's name and logos.

7.      While officers receive their insurance contracts from USAA solely and directly, USAA, using its terminology, "places" its second-class customers with one of its three subsidiary insurance companies: Defendant USAA General Indemnity Company ("USAA-GIC"); Defendant USAA Casualty Insurance Company ("USAA-CIC"); or Defendant Garrison Property and Casualty Insurance Company ("Garrison"). The subsidiary insurance companies' value and profits flow directly into USAA and are then shared with real USAA Members (i.e., officers) as allocations of USAA's retained earnings to their subscriber accounts and through annual distributions of excess surplus paid either in cash or as a credit toward the member's insurance bill. By contrast, neither USAA nor its subsidiary insurance companies allocate any retained earnings or distribute any excess surplus to nominal members (although USAA-CIC, in which the adult children of officers are placed, usually declares a modest dividend each year).

8.      The result of USAA's unfair, deceptive, and misleading practices and systematic breach of its contractual promise of membership is that Plaintiffs and those similarly situated have been and continue to be denied the benefits of USAA membership, including the benefits of sharing in allocations of USAA's retained earnings and annual distributions of USAA's excess surplus.

9.      Plaintiffs bring this class action on behalf of themselves and all others similarly situated, seeking monetary damages, permanent injunctive relief, and other relief on behalf of the proposed Classes.

## PARTIES

10.     Plaintiff Brian Lynn Capps is a citizen of the State of Texas, residing in Lindale, TX 75771. Mr. Capps served in the Army from approximately 2006 to 2019. He achieved the rank of Specialist at paygrade E-4 before separating from the Army. Mr. Capps purchased USAA automobile insurance from USAA for two separate periods. The first period ended in approximately 2013, and the second was from approximately 2019 through late 2023. During this time, USAA assigned Mr. Capps a unique USAA Member Number and placed Mr. Capps' insurance contracts with USAA-GIC. USAA issued the Texas Auto Policy that is part of Mr. Capps' automobile insurance contracts. Throughout at least the past decade, Mr. Capps has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Capps decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer. Mr. Capps was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

11.     Plaintiff Alex Guerrero is a citizen of the State of California, residing in Corona, CA 92878. Mr. Guerrero served in the Army from approximately 2004 to 2019. He achieved the rank of Staff Sergeant at a paygrade E-6 before separating from the Army. Mr. Guerrero has been continuously insured by USAA since 2004. He has purchased automobile, home, and personal property insurance from USAA. USAA assigned Mr. Guerrero a unique USAA Member Number and placed Mr. Guerrero's insurance contracts with USAA-GIC. USAA issued the California Auto

Policy that is part of Mr. Guerrero's automobile insurance contracts. Throughout at least the past decade, Mr. Guerrero has viewed countless television advertisements and other advertisements and messages   by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Guerrero decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer. Mr. Guerrero was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

12.     Plaintiff Christopher Gutierrez is a citizen of the State of Texas, currently residing in Austin, TX 78254. Mr. Gutierrez is an adult family member of a USAA member. He purchased automobile insurance from USAA from 2010 through 2021. USAA assigned Mr. Gutierrez a unique USAA Member Number and placed Mr. Gutierrez's insurance contracts with USAA-CIC. USAA issued the Texas Auto Policy which is part of Mr. Gutierrez's automobile insurance contracts. Throughout at least the past decade, Mr. Gutierrez has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Gutierrez decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him

deciding to become and remain a USAA customer. Mr. Gutierrez was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

13.     Plaintiff Chandradat Persaud is a citizen of the State of Arizona, temporarily working and living abroad (in Kuwait on a contract basis), but maintaining a residence in and intending to return to El Mirage, AZ 85335 (where his wife and children continue to reside while he completes his contract). Mr. Persaud served in the Marines from approximately 2004 to 2018. He achieved the rank of Staff Sergent at a paygrade of E-6 before separating from the Marines. He has been continuously insured by USAA since 2004. He purchased automobile and renter's insurance from USAA. USAA assigned Mr. Persaud a unique USAA Member Number and placed Mr. Persaud's insurance contracts with Garrison. USAA issued the Arizona Auto Policy that is part of Mr. Persaud's automobile insurance contracts. Throughout at least the past decade, Mr. Persaud has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Persaud decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer. Mr. Persaud was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

14.     Plaintiff Jessie Ramos is a citizen of the State of Illinois, residing in Chicago, IL 60623. Mr. Ramos served in the Army from approximately 2007 to 2012. He achieved the rank of Specialist at paygrade E-4 before separating from the Army. He purchased automobile insurance

7

from USAA from approximately 2008 to 2019 and then again from approximately 2022 to present. USAA assigned Mr. Ramos a unique USAA Member Number and placed Mr. Ramos' insurance contracts with USAA-GIC. USAA issued the Illinois Auto Policy that is part of Mr. Ramos' automobile insurance contracts. Throughout at least the past decade, Mr. Ramos has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Ramos decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer. Mr. Ramos was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

15.     Plaintiff Miguel Galarza is a citizen of the State of New Jersey, residing in New Milford, NJ 07646. Mr. Galarza served in the Army starting in 2001 and in the National Guard starting in 2005. He had a break in service and then served at the rank of Staff Sergeant at paygrade E-6 until January of 2024, when he was promoted to the rank of Sergeant First Class. He has purchased automobile insurance from USAA since approximately 2013 as well as homeowners' insurance and umbrella insurance from USAA for some or all of that period.  USAA assigned Mr. Galarza a unique USAA Member Number and placed Mr. Galarza's insurance contracts with USAA-GIC. USAA issued the New Jersey Auto Policy that is part of Mr. Galarza's automobile insurance contracts. Throughout at least the past decade, Mr. Galarza has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to

be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Galarza decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer. Mr. Galarza was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

16.     Plaintiff Eugene Horton is a citizen of the State of Washington, currently residing in Edmonds, WA 98026. Mr. Horton served in the Navy from 1961 to 1966. He was at paygrade E-3 before separating from the Navy. Mr. Horton purchased USAA automobile insurance from USAA from July 2018 through June 2023. He also purchased Homeowners and Umbrella insurance from USAA from June 2018 through June 2023, as well as a Medicare Supplement policy from USAA from January 2019 through January 2023. During this time, USAA assigned Mr. Horton a unique USAA Member Number and placed Mr. Horton's Automobile, Homeowners, and Umbrella insurance contracts with USAA-GIC. USAA issued the Washington Auto Policy that is part of Mr. Horton's automobile insurance contracts. Throughout at least the past decade, Mr. Horton has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Horton decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer.

Mr. Horton was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

17.     Plaintiff Lindsey Kibler is a citizen of the State of New Mexico, residing in Albuquerque, NM 87120. Ms. Kibler served in the Army from approximately 2006 to 2015. She achieved the rank of Staff Sergeant at paygrade E-6 before separating from the Army. Ms. Kibler purchased USAA automobile insurance from approximately 2005 to the present and USAA renter's insurance from approximately 2020 to the present. She also currently has a personal articles floater with USAA. At the time she acquired automobile insurance from USAA, USAA assigned Ms. Kibler a unique USAA Member Number and placed her insurance contracts with USAA-CIC. USAA issued the New Mexico Auto Policy that is part of Ms. Kibler's automobile insurance contracts. Throughout at least the past decade, Ms. Kibler has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that she was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Ms. Kibler decided to become a USAA customer and repeatedly renewed her USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for her deciding to become and remain a USAA customer. Ms. Kibler was not aware that USAA had denied her any of the benefits of USAA membership until shortly before she joined this lawsuit.

18.     Plaintiff James Lindemier is a citizen of the State of Nevada, residing in Sparks, NV 89434. Mr. Lindemier served in the Army from approximately 2004 to 2007. He achieved the rank of Specialist at paygrade E-4 before separating from the Army. Mr. Lindemier purchased USAA automobile insurance from USAA from approximately 2008 to 2022 and USAA

homeowners insurance from approximately 2010 to 2022. During this time, USAA assigned Mr. Lindemier a unique USAA Member Number and placed Mr. Lindemier's insurance contracts with USAA-GIC. USAA issued the Nevada Auto Policy that is part of Mr. Lindemier's automobile insurance contracts. Throughout at least the past decade, Mr. Lindemier has viewed countless television advertisements and other advertisements and messages by USAA substantially similar to those described in paragraphs 40-52 of this Complaint, which indicated that he was eligible to be, and, upon obtaining USAA insurance coverage, was a real USAA member, entitled to all the benefits of membership. In reliance on these USAA representations, Mr. Lindemier decided to become a USAA customer and repeatedly renewed his USAA insurance and continued to pay premiums for same. USAA's representations in this regard were a substantial and material reason for him deciding to become and remain a USAA customer. Mr. Lindemier was not aware that USAA had denied him any of the benefits of USAA membership until shortly before he joined this lawsuit.

19.     Defendant United Services Automobile Association ("USAA") is a citizen of the State of Texas, with its headquarters in San Antonio, Texas. It is a reciprocal interinsurance exchange.

20.     USAA places the insurance contracts of its nominal members in one of its stock subsidiaries, USAA-GIC, USAA-CIC, and Garrison (collectively, "the stock subsidiaries"), which are all under Defendant USAA's management and control. Defendant USAA owns 100% of the common stock of USAA-CIC and USAA-GIC. USAA-CIC owns 100% of the common stock of Garrison. These stock subsidiaries make up a substantial portion of the total value of USAA.

21.     Defendant USAA General Indemnity Company is a citizen of the State of Texas, with its headquarters in San Antonio, Texas. It is a stock insurance company.

22.     Defendant USAA Casualty Insurance Company is a citizen of the State of Texas, with its headquarters in San Antonio, Texas. It is a stock insurance company.

23.     Defendant Garrison Property and Casualty Insurance Company is a citizen of the State of Texas, with its headquarters in San Antonio, Texas. It is a stock insurance company.

## JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over Defendants because they are all citizens of the State of Texas that have a common headquarters and principal place of business in the State of Texas.

25.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Classes is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (c) the proposed Classes each consist of more than 100 class members, and (d) none of the enumerated exceptions apply to this action.

26.     Venue is proper in the Western District of Texas under 28 U.S.C. §§ 1391(b)(1) and (2) because the Defendants have their headquarters and principal place of business in this District and a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### 1.  Membership in USAA

27.     United States Army Automobile Insurance Association was formed as a reciprocal interinsurance exchange in San Antonio, Texas on June 19, 1922. In 1924, the name was changed to United Services Automobile Association ("USAA").

28.     Originally, only active U.S. Army officers and warrant officers were eligible to purchase USAA insurance. During its first 45 years, USAA progressively expanded eligibility. By 1960, USAA's policyholders included active and former commissioned and warrant officers of all branches of the U.S. military (including members of the Reserves and National Guard not on active duty), and U.S. Coast Guard, unmarried widows of former policyholders, Foreign Service Officers, and USAA employees.

29.     From its earliest days, USAA used the term "member" to describe its policyholders. Indeed, USAA described (and continues to describe itself as "member-owned."

30.     Pursuant to USAA's bylaws, USAA members ("real members" as described herein) are entitled to:

> a.     *Allocations of USAA's retained earnings.* USAA's retained earnings allocated to members currently exceed $10 billion. Each member's allocation is recorded and remains in an individual member's subscriber account until six months after the expiration or cancellation of that member's last in-force policy. If the member does not take out a new policy from USAA during that six-month period, then the current allocation amount in their account is paid to the former member in cash in the form of a termination distribution. The average individual allocation of retained earnings is believed to be in the range of $2,000. Per USAA's Annual Report, for 2023, USAA paid $323 million in these termination distributions.
>
> b.     *Annual distributions of USAA's excess surplus (i.e., capital that is in excess of that required by regulators or to ensure USAA's financial stability).* Per USAA's Annual Report, for 2023, these annual distributions totaled $323 million. Those

that have been members for more than 40 years receive an additional senior bonus, which, for 2023, totaled $293 million.

31.   Before the late 1960s, USAA did not own or operate any of the stock insurance company subsidiaries. Accordingly, a customer that purchased a USAA policy was necessarily a USAA member. Member status entitled that customer to a share of USAA's retained earnings and distributions from excess surplus. Indeed, it was that sense of common enterprise built upon a foundation of military fraternity that distinguished USAA from all other insurance companies.

32.   In 1962, USAA amended its bylaws to allow it to organize wholly owned subsidiary companies. In 1968, USAA formed United Services Casualty Insurance Company, which was renamed USAA Casualty Insurance Company ("USAA-CIC") in 1970. In 1972, USAA formed USAA General Indemnity Comp any ("USAA-GIC"). These stock subsidiaries were originally formed to address regulatory challenges with USAA's reciprocal structure. Specifically, USAA-CIC was used for military officers in Ohio, Vermont, and New Hampshire. Related regulatory challenges in Ohio later necessitated the formation of USAA-GIC.

33.   As U.S. involvement in the Vietnam War began to wind down in the early 1970s, USAA faced a stagnant or even shrinking customer base of military officers. To spur growth, USAA began marketing its insurance products to the adult children of USAA members in 1973. USAA placed the insurance contracts for those customers with its stock subsidiary USAA-CIC.

34.   Facing a stagnant or shrinking customer base again in the wake of the end of the Cold War, USAA began marketing its insurance products to enlisted personnel in 1996. USAA placed the insurance contracts for those customers with USAA-GIC.

35.   In 2003, USAA began marketing its insurance products to the adult children of enlisted personnel and grandchildren of officers. USAA placed the insurance contracts for those customers with Garrison.

36.   In the early period of this expansion, USAA continued to refer to officers placed with USAA as members and granted them the benefits of USAA membership. By contrast, during this early period of expansion, enlisted personnel and others whose insurance contracts USAA placed with one of its subsidiaries were simply referred to as "customers." They were not referred to as members and were not granted the benefits of membership.

37.   Eventually, USAA found that drawing such a clear and honest distinction between members and non-members was not good for business. Accordingly, USAA's Board of Directors adopted a resolution in 1986 fabricating the title "associate member" to be assigned to non-member customers whose insurance contracts USAA had placed with one of its stock subsidiaries. Although the title implied some membership-based relationship with USAA, this "associate membership" status came without any of the benefits of real USAA membership.

38.   Under this arrangement, real members held ownership rights in USAA and received their insurance directly and solely from USAA. However, associate members had no ownership rights, and their insurance contracts were placed by USAA with one of its stock subsidiaries. As the then-USAA CEO Robert F. McDermott told the Harvard Business Review in 1991: "As associate members, they can buy insurance, but they have no ownership." Asked whether he had considered opening (real) membership beyond the officer class, CEO McDermott responded: "But where do we stop? And do we give them ownership? Our present members get special treatment and they need special treatment."

39.   Around 2000, USAA decided to extinguish any transparency into its two-tiered customer structure. At that time, and continuing to this day, USAA stopped openly referring to enlisted personnel and military family member customers as "associate members" and started pervasively and uniformly using the terms "member" and "membership" freely across its platforms and communications to describe all customers without differentiating between real members (officers) and nominal (or "fake") members (enlisted personnel and military family members).

40.   To this day, USAA solicits customers by representing eligibility criteria for USAA membership, including criteria for both real membership and nominal membership, without ever mentioning the existence of associate membership. For example, the following are excerpts from USAA's current website:[2]

## Who's eligible for USAA membership?

Join now   Learn more >

- Active Duty military
- National Guard and Reservists
- Veterans who have honorably served
- Contracted ROTC Cadets and Midshipmen
- Officer and Warrant Officer Candidates
- Military spouses
- Children of USAA members
- Service Academy appointees

---

[2] https://www.usaa.com/ (accessed August 29, 2024); https://www.usaa.com/join/get-started/?product=join-now&wa_ref=pub_home_mbrship_join_now (accessed August 29, 2024); and https://www.usaa.com/inet/wc/about_usaa_corporate_overview_history (accessed August 29, 2024).





41.   For many years, USAA has engaged in a pervasive, national marketing campaign—including both national television ads, radio ads, and via social media and other online advertising—misleadingly featuring and using the terms "member" or "membership" across all USAA customers and potential customers, without differentiating between real members (officers) and nominal (or "fake") members (enlisted personnel and military family members).

42.   A current internet search, alone, yields misleading USAA advertisements still accessible today that go back at least a decade. For example, a 2019 advertising campaign featured images of various families, with a narrator reading:

> Think you have an idea of who a USAA member is? You might be surprised. The fact is every one of these people is a USAA member. Some served a short time. Some enlisted decades ago. And some have family who served.

17



https://www.ispot.tv/ad/o6Bq/usaa-veterans (accessed July 22, 2024).

43.  A currently running campaign features two women at a barbeque and the following

dialogue:

WOMAN 1: USAA, you were in the military?

WOMAN 2: Oh, no, I wasn't, but my grandpa was. He joined USAA, passed membership

to my mom, then to me.



This same advertisement has appeared on television and online. In May 2023, for example, it

appeared on Facebook alongside the following text, encouraging Facebook users to "[s]ee if a

spouse, parent, or grandparents can pass membership to you."

18



https://www.facebook.com/USAA/videos/usaa-commercial/267517940612135/ (accessed July 22, 2024).

44.    Similarly, in a 2014 advertising campaign, a youthful granddaughter of Apollo 14 astronaut Stuart Roosa is listed on screen as a "Future USAA Member" and states that her eligibility was earned "orbiting the moon in 1971."





https://www.youtube.com/watch?v=FIvoAZ3Y0IM (accessed July 22, 2024);

https://www.ispot.tv/ad/7T7m/usaa-generation-to-generation (accessed July 22, 2024).

45.    A 2018 advertising campaign features a mother holding two young children and stating: "I love that I can pass a membership to my children, and they can be protected. We're the Williams family and we're USAA members for life."



https://www.youtube.com/watch?v=QEiREwAinFU (accessed July 22, 2024).

46.     USAA has also run a series of pervasive advertisements over the past several years featuring Super Bowl champion Rob Gronkowski, wherein he expresses envy at the various military family members eligible for USAA membership in what are intended to be humorous ways. For example, in one such ad, Gronkowksi encounters a mother and infant in a grocery store parking lot, where he comments that the child is a "lucky kid" because she can become a USAA member. In the Facebook version of the advertisement, USAA likewise explains that the "baby [is] eligible or USAA membership" because "[h]er grandpa served and passed membership down."



https://www.facebook.com/story.php?story_fbid=10160797159934664&substory_index=0&id=7239334663&m_entstream_source=timeline (accessed July 22, 2024); *see also*

https://www.youtube.com/watch?v=7toG2oT4Vhc (video version of advertisement) (accessed

July 22, 2024).

47.     As another example, in a 2023 advertisement set at pickle ball court, a young

woman asks Gronkowski where he "learned to serve." With the USAA membership he wants on

his mind, he misunderstands the question and answers that he did not serve, but "if your spouse,

parent, or grandparent served in the military, they can share USAA membership with you." His

pickle ball partner, a man in an Army t-shirt says, "I'm a member." The young woman responds:

"I'm a member, too."





https://www.ispot.tv/ad/5Wmx/usaa-serve-featuring-rob-gronkowski (accessed July 22, 2024).

48.     USAA's website also features the following graphic depicting "membership" being passed from family member to family member in the form of a football play diagram.



https://www.usaa.com/inet/wc/ins_auto_nfl_landing_mkt?vurl=vurl_nfl (accessed July 22, 2024).

49.     In fact, whether a grandparent or parent customer is a real or nominal member, they cannot pass on real USAA membership to their kin (i.e., in both instances, the kin can only be a nominal member). Nevertheless, on August 20, 2024, the current CEO of USAA, Wayne Peacock, sent a deceptive and misleading email to all of USAA's real and nominal members claiming: "I became a USAA member through my father-in-law who served as a career officer in the Army Corps of Engineers." But again, in fact, one cannot become a real member via a family member.

50.     USAA's misleading advertising described above and similar ads have been pervasive on television, radio, social media, and other online advertising for many years. Plaintiffs and the members of the proposed Classes have all been extensively exposed to these campaigns and ads.

51.     USAA also issues each of its customers a "USAA Member Number." The USAA member number is the primary means by which USAA customers identify themselves in communications with the USAA organization. Both real members and nominal members receive a "USAA Member Number." By way of example only, if a customer (whether real or nominal) forgets their Online ID, the USAA website instructs the customer to recover their Online ID by "Entering your Social Security/Tax ID or USAA member number."[3]



---

[3] https://mobile.usaa.com/my/profile-recovery?i=o (accessed August 22, 2024).

52.     USAA also uses its insurance policies to unfairly deceive and mislead nominal members into believing they are real members. For example, USAA's homeowners insurance form for use with both real and nominal members defines the term "member" as "the owner of the policy who is the person who meets all eligibility requirements for membership and whose membership number is shown in the Declarations of this policy." This definition when used with respect to nominal members unfairly and deceptively leads those nominal members to understand that if they own the policy and their membership number appears in the Declarations, they meet all eligibility requirements for membership and are therefore members.

53.     USAA's most popular product is automobile insurance, generating more than $15 billion per year in premium payments. USAA's standard auto policy, issued by USAA to both real members and nominal members, provides, under the USAA name, address, and logo:

> If this policy is issued by United Services Automobile Association ("USAA") … by purchasing this policy you are a member of USAA and are subject to its bylaws [and] the board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts…. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

This provision when used with respect to nominal members leads those nominal members to understand they are members of USAA with the right to participate in the annual allocation.

54.     Additionally, materials that USAA sends to both real- and nominal-member automobile insurance customers explain that "USAA considers many factors when determining your premium" including "your USAA payment history."

55.     USAA also pervasively, prominently, and proudly asserts—including in mass marketing—that it is "member owned." This leads nominal members—whom have been told and led to believe they are real members—to understand they have an ownership interest in USAA.

56.     Defendants' unfair scheme to mislead and deceive nominal members into believing they are real USAA members has thus been carried out by, *inter alia*:

    a.  Concealing from nominal members their status as "associate members," which for decades has been a hidden, purely internal (i.e., within the company) term of distinction;

    b.  Utilizing patently confusing language for nominal members that plainly connotes they are eligible to be and are members;

    c.  Issuing nominal members a USAA member number; and

    d.  Designing its insurance contracts to promise and reinforce the belief that nominal members are members.

**2.   USAA and Its Subsidiary Insurers**

57.     USAA is a reciprocal interinsurance exchange.

58.     USAA-CIC, USAA-GIC, and Garrison are stock insurance companies and wholly owned subsidiaries of USAA.

59.     The stock subsidiaries' insurance services are administered by USAA.

60.     The stock subsidiaries' directors and executives are also USAA employees.

61.     Through expense allocation to the stock subsidiaries, royalty payments, and corporate dividends, money generated by the stock subsidiaries flows up to USAA. The three stock subsidiaries are held as an investment on USAA's balance sheet with profits sent upstream to USAA (and therefore from nominal members to real members, in the form of annual allocations and distributions as described herein). The stock subsidiaries (and their nominal member customers) exist to enhance the financial performance of USAA, which in turn generates more retained earnings and excess surplus that are then allocated and distributed to real members. Nearly

two-thirds of USAA's customer base are nominal members, the profits from whom ultimately benefit real members. USAA's disparate treatment of nominal members and real members is also reflected in USAA's placement of nominal members' insurance contracts with specific stock insurance subsidiaries. Each of the four USAA insurance companies is used for a different segment of the military or their family members. USAA keeps for itself commissioned officers and senior non-commissioned officers in pay grades E-7 or higher (i.e., real USAA members). USAA places the insurance contracts of the adult children of real USAA members with USAA-CIC. USAA places the insurance contracts of enlisted personnel in pay grades E-1 through E-6 with USAA-GIC. USAA places the insurance contracts of military family members that are not placed with USAA-CIC (i.e., adult children of real members) with Garrison.

### 3.  Allocations and Annual Distributions

62.     USAA's bylaws require its Board of Directors to determine the amount of surplus (i.e., capital) accruing from the operation of USAA (i.e., retained earnings), if any. Upon that determination, these retained earnings must be allocated to members. USAA's retained earnings include the revenues flowing upstream to USAA from the stock subsidiaries. Specifically, Article XII, Section 1 of USAA's bylaws requires the USAA Board of Directors to determine "[s]urplus accruing from the operation of USAA" (i.e., retained earnings), if any, for allocation to individual members' subscriber accounts.

> Section 1. The Surplus accruing from the operation of USAA shall be allocated and/or segregated in the Surplus Account as required by regulatory authorities or as the board of directors may determine.

Article XII, Section 3 of USAA's bylaws mandates that six months after termination of membership, the balance of retained earnings allocated to the member's subscriber account be paid to the member.

> Section 3. In the event membership in USAA is terminated for any reason for a period of six
> months, the amount accumulated in the Subscriber's Account will be paid to the member. If
> membership is terminated by the death of a member, payment will be made to the widow(er) or, if
> there is no surviving spouse, to the estate. However, if a widow(er) entitled to such payment
> chooses to continue membership in his or her name, at the option of the widow(er), such amount
> may be paid to the widow(er) or retained in the subscriber's account; any election to receive such
> payment must be made in conjunction with the decision to continue membership in such
> widow(er)'s name.

63.     USAA's bylaws require its Board of Directors to determine the amount of USAA's *excess* surplus (i.e., excess capital), if any. Upon that determination, this excess surplus must be distributed to members. Specifically, Article XII, Section 2 of USAA's bylaws requires the Board of Directors to determine the amount of surplus "in excess of that required … for the financial stability of USAA," which amount "shall be returned to members."

> Section 2. The Surplus in excess of that required by regulatory authorities or for the financial
> stability of USAA as determined by the board of directors shall be returned to members under
> rules formulated by the board of directors.

64.     For each of the past 12 years (and for most, if not all, years prior), USAA's Board of Directors has determined that it holds retained earnings and excess surplus. Based on these determinations, in each of at least the past 12 years, USAA has annually allocated USAA's retained earnings to individual real members' subscriber accounts and annually distributed USAA's excess surplus to real members as cash or a credit toward the real member's insurance bill.

65.     For each member, the dollar amount of annual distribution is a percentage of that member's subscriber account balance. For example, for 2023 the annual distribution was 3% of each member's subscriber account balance immediately prior to the 2023 allocation of retained earnings. Similarly, the senior bonus is a percentage of an eligible member's subscriber account balance. For example, for 2023 the senior bonus was 10% of each eligible member's subscriber account balance immediately prior to the 2023 allocation of retained earnings.

28

66.     Likewise, throughout at least the past 12 years, those real members who have terminated their memberships have consistently received substantial termination distributions from the liquidation of those subscriber accounts, per Article XII, Section 3, as shown below.

> Section 3. In the event membership in USAA is terminated for any reason for a period of six months, the amount accumulated in the Subscriber's Account will be paid to the member. If membership is terminated by the death of a member, payment will be made to the widow(er) or, if there is no surviving spouse, to the estate. However, if a widow(er) entitled to such payment chooses to continue membership in his or her name, at the option of the widow(er), such amount may be paid to the widow(er) or retained in the subscriber's account; any election to receive such payment must be made in conjunction with the decision to continue membership in such widow(er)'s name.

67.     Per USAA's Annual Statements and Annual Report to Members (where available), the figures for the past 12 years are as follows:

a. 2023: $10,409,661,922 in retained earnings allocated among real members' accounts; approximately $939 million distributed to real members, consisting of $616 million in excess surplus paid out to real members via annual and senior bonus distributions; and $323 million in termination distributions;

b. 2022: $11,347,000,000 in retained earnings allocated among real members' accounts; approximately $1.008 billion distributed to real members, consisting of $658 million in excess surplus paid out to real members via annual and senior bonus distributions; and $350 million in termination distributions;

c. 2021: $12,056,028,311 in retained earnings allocated among real members' accounts; approximately $1.016 billion distributed to real members, consisting of $658 million in excess surplus paid out to real members via annual and senior bonus distributions; and $277 million in termination distributions;

d. 2020: $9,638,182,330 in retained earnings allocated among real members' accounts; approximately $1.162 billion distributed to real members, consisting of $914 million in excess surplus paid out to real members via annual and senior bonus distributions; and $248 million in termination distributions;

e. 2019: $10,801,136,888 in retained earnings allocated among real members' accounts; approximately $1.351 billion distributed to real members, consisting of $1.108 billion in excess surplus paid out to real members via annual and senior bonus distributions; and $243 million in termination distributions;

f. 2018: $10,604,261,431 in retained earnings allocated among real members' accounts; approximately $916 million distributed to real members, consisting of $691 million in excess surplus paid out to real members via annual and senior bonus distributions; and $225 million in termination distributions;

g. 2017: $10,584,718,322 in retained earnings allocated among real members' accounts; approximately $792 million distributed to real members, consisting of $582 million in excess surplus paid out to real members via annual and senior bonus distributions; and $210 million in termination distributions;

h. 2016: $10,426,447,956 in retained earnings allocated among real members' accounts; approximately $720 million distributed to real members, consisting of $524 million in excess surplus paid out to real members via annual and senior bonus distributions; and $197 million in termination distributions;

i. 2015: $10,302,564,117 in retained earnings allocated among real members' accounts; approximately $908 million distributed to real members, consisting of

$727 million in excess surplus paid out to real members via annual and senior bonus distributions; and $181 million in termination distributions;

j.  2014:   $9,782,161,852 in retained earnings allocated among real members' accounts; $839,690,944 distributed to real members via annual, senior bonus, and termination distributions;

k.  2013: $9,076,098,220 in retained earnings allocated among real members' accounts; $836,011,430 distributed to real members via annual, senior bonus, and termination distributions; and

l.  2012: $8,228,165,271 in retained earnings allocated among real members' accounts; $710,296,043 distributed to real members via annual, senior bonus, and termination distributions.

68.    By contrast, nominal members received no annual or senior bonus distributions from USAA's excess surplus, received no allocations of USAA's retained earnings, and received no termination distributions. (Although USAA-CIC usually declares a very modest dividend, these dividend payments are a small fraction of the annual distribution amounts that real members receive; USAA-GIC and Garrison declared no dividend at all.)

69.    As of December 31, 2023, USAA's Annual Statement reported total policyholder surplus (i.e., capital) of $25,383,639,147, of which the Board of Directors had determined $10,409,661,922 represented policyholder surplus accruing from the operations of USAA (i.e., retained earnings) and of which the Board determined $616 million was in excess of the amount required to ensure the financial stability of USAA (i.e., excess surplus) as represented in the following proportionate graphic:



## CLASS ALLEGATIONS

70.     Plaintiffs bring this action both individually and as a class action, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of themselves and the following Classes.

71.     The Breach of Contract Class is defined as:

All purchasers of one or more USAA automobile insurance contracts placed with USAA-CIC, USAA-GIC, or Garrison where at least one such insurance contract

included a policy containing the following provision or a substantially similar provision:

> If this policy is issued by United Services Automobile Association ("USAA"), . . . [b]y purchasing this policy you are a member of USAA and are subject to its bylaws.

72.     The Arizona Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of Arizona placed with USAA-CIC, USAA-GIC, or Garrison.

73.     The California Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of California placed with USAA-CIC, USAA-GIC, or Garrison.

74.     The Illinois Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of Illinois placed with USAA-CIC, USAA-GIC, or Garrison.

75.     The New Jersey Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of New Jersey placed with USAA-CIC, USAA-GIC, or Garrison.

76.     The Washington Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of Washington placed with USAA-CIC, USAA-GIC, or Garrison.

77.     The Texas Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of Texas placed with USAA-CIC, USAA-GIC, or Garrison.

78.     The New Mexico Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of New Mexico placed with USAA-CIC, USAA-GIC, or Garrison.

79.     The Nevada Class is defined as:

All purchasers of one or more USAA property and casualty insurance products in the State of Nevada placed with USAA-CIC, USAA-GIC, or Garrison.

80.     **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria, so as to allow class members to determine if they are part of the Classes. Further, the members can be readily identified through records and information in Defendants' possession, custody or control. For example, USAA records and retains in its systems customers' names and contact information, USAA member number, state of residence, and company of placement for each of its customers.

81.     **Numerosity**. The Classes are so numerous and geographically dispersed that joinder of individual members is impracticable. The exact numbers of members of the Classes, as herein identified and described, are not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, but Plaintiffs estimate that there are millions of customers in the Breach of Contract Class and hundreds of thousands of customers in each of the State Classes.

82.     **Commonality and Predominance**. Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Classes, including the following:

    a.   Whether Defendants' conduct as described herein constitutes a breach of contract as to Plaintiffs and the members of the Breach of Contract Class;

    b.   Whether Defendants' conduct as described herein breached the implied covenant of good faith and fair dealing;

    c.   Whether Defendants' conduct as described herein violates Arizona's Consumer Fraud Act and Unfair Insurance Practices Act;

    d.   Whether Defendants' conduct as described herein constitutes a violation of the California Unfair Competition Law;

e.  Whether Defendants' conduct as described herein constitutes a violation of the Illinois Consumer Fraud Act;

f.  Whether Defendants' conduct as described herein constitutes a violation of New Jersey's Consumer Protection Act;

g.  Whether Defendants' conduct as described herein constitutes a violation of the Texas Deceptive Trade Practices Act;

h.  Whether Defendants' conduct as described herein constitutes a violation of Washington's Consumer Protection Act;

i.  Whether Defendants' conduct as described herein violates New Mexico's Unfair Practices Act and Unfair Insurance Practices Act; and

j.  Whether Defendants' conduct as described herein violates Nevada's Deceptive Trade Practices Act.

83.     **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes sustained damages arising out of Defendants' common course of conduct as described herein and their claims arise under the same legal theories.

84.     **Adequacy**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the other members of the Classes. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the Classes.

85.     **Superiority**. Class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members is impracticable. Trial of this case on a class basis will be manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

86.     The elements of Rule 23(b)(2) are also met. Absent injunctive relief, Defendants will continue to commit the violations alleged herein. USAA has acted on grounds that apply generally to members of the Classes so that preliminary and/or final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

### FIRST CAUSE OF ACTION
### Breach of Contract
### (On Behalf of the Breach of Contract Class)

87.     Plaintiffs, on behalf of themselves and the Breach of Contract Class, re-allege and incorporate by reference all paragraphs above as if fully stated herein.

88.     Plaintiffs and the putative Breach of Contract Class members each entered into automobile insurance contracts with Defendants.

89.     The pertinent provisions of the automobile insurance contracts entered into by Plaintiffs and the putative Breach of Contract Class are the same or materially the same.

90.     Defendants' automobile insurance contracts with Plaintiffs and the putative Breach of Contract Class members consist of three component parts: (a) the "*policy*" to which USAA typically assigns form number 5100 or AUT5200; (b) the "*Declarations page*" to which USAA typically assigns form number 5000 or AUT5000; and (c) any applicable endorsements. USAA articulates this three-part contractual structure in the first sentence of its auto policy (applicable to Plaintiffs and all putative Breach of Contract Class members), which states:

The automobile insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements.

91.     In addition, the automobile insurance contract that USAA delivered to each of the Plaintiffs and putative Breach of Contract Class members further states that if the *policy* (i.e., the first component of the contract) is issued by USAA, then the named insured is: (a) a member of USAA and subject to its bylaws; (b) entitled to an allocation of a portion of USAA's surplus (i.e., USAA's retained earnings); and (c) entitled to a distribution of that allocation following termination of membership. Specifically, the policy states:

> If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:
>
> • By purchasing this policy you are a member of USAA and are subject to its bylaws.
>
>                  . . . .
>
> • The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

92.     With respect to each of the Plaintiffs and putative Breach of Contract Class members, the *policy*, as defined by USAA in the automobile insurance contract, was issued by USAA.[4] Among other evidence that USAA issued the *policy*, the heading of the policy expressly identifies USAA as the issuer. For example, the heading of the auto policies issued to Plaintiffs Capps and Gutierrez provide in relevant part:

---

[4] The first page of each policy defines "USAA" as United Services Automobile Association.



**USAA**
9800 Fredericksburg Road
San Antonio, Texas 78288

## TEXAS AUTO POLICY

### READ YOUR POLICY, DECLARATIONS AND ENDORSEMENTS CAREFULLY

The automobile insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

**The policy provides the coverages and amounts of insurance shown on the Declarations for which a premium is shown.**

This is a participating policy.  You are entitled to dividends as may be declared by the company's board of directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

*   By purchasing this policy you are a member of USAA and are subject to its bylaws.

*   This is a non-assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.

*   The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

Similarly, the auto policy issued to Plaintiff Persaud provides in relevant part:



ARIZONA
AUTO POLICY

**READ YOUR POLICY, DECLARATIONS AND ENDORSEMENTS CAREFULLY**

The auto insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

**The policy provides the coverages and amounts of insurance shown on the Declarations for which a premium is shown.**

This is a participating policy. You are entitled to dividends as may be declared by the board of directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

- By purchasing this policy you are a member of USAA and are subject to its bylaws.
- This is a non-assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.
- The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

Similarly, the auto policy issued to Plaintiff Guerrero provides in relevant part:



Similarly, the auto policy issued to Plaintiff Ramos provides in relevant part:



## ILLINOIS
## AUTO POLICY

**READ YOUR POLICY, DECLARATIONS AND ENDORSEMENTS CAREFULLY**

The automobile insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

**The policy provides the coverages and amounts of insurance shown on the Declarations for which a premium is shown.**

This is a participating policy. You are entitled to dividends as may be declared by the board of directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

- By purchasing this policy you are a member of USAA and are subject to its bylaws.
- This is a non-assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.
- The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

Similarly, the auto policy issued to Plaintiff Galarza provides in relevant part:



Similarly, the auto policy issued to Plaintiff Horton provides in relevant part:

40



**USAA**
9800 Fredericksburg Road
San Antonio, Texas 78288

## WASHINGTON  AUTO  POLICY

### READ  YOUR  POLICY,  DECLARATIONS AND ENDORSEMENTS  CAREFULLY

The automobile insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

**The policy provides the coverages and amounts of insurance shown on the Declarations for which a premium is shown.**

This is a participating policy. You are entitled to dividends as may be declared by the board of directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

- By purchasing this policy you are a member of USAA and are subject to its bylaws.

- This is a non-assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.

- The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

Similarly, the auto policy issued to Plaintiff Kibler provides in relevant part:



**USAA**
9800 Fredericksburg Road
San Antonio, Texas 78288

## NEW MEXICO AUTO POLICY

READ YOUR POLICY, DECLARATIONS
AND ENDORSEMENTS CAREFULLY

The automobile insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

**The policy provides the coverages and amounts of insurance shown on the Declarations for which a premium is shown.**

This is a participating policy. You are entitled to dividends as may be declared by the board of directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

• By purchasing this policy you are a member of USAA and are subject to its bylaws.

• This is a non–assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.

• The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

Similarly, the auto policy issued to Plaintiff Lindemier provides in relevant part:



**USAA**
9800 Fredericksburg Road
San Antonio, Texas 78288

## NEVADA AUTO POLICY

### READ YOUR POLICY, DECLARATIONS AND ENDORSEMENTS CAREFULLY

The automobile insurance contract between the named insured and the company shown on the Declarations page consists of this policy plus the Declarations page and any applicable endorsements. The Quick Reference section outlines essential information contained on the Declarations and the major parts of the policy.

**The policy provides the coverages and amounts of insurance shown on the Declarations for which a premium is shown.**

This is a participating policy. You are entitled to dividends as may be declared by the board of directors.

If this policy is issued by United Services Automobile Association ("USAA"), a reciprocal interinsurance exchange, the following apply:

- By purchasing this policy you are a member of USAA and are subject to its bylaws.

- This is a non-assessable policy. You are liable only for the amount of your premium as USAA has a free surplus in compliance with Article 19.03 of the Texas Insurance Code of 1951, as amended.

- The board of directors may annually allocate a portion of USAA's surplus to Subscriber's Accounts. Amounts allocated to such accounts remain a part of USAA's surplus and may be used as necessary to support the operations of the Association. A member shall have no right to any balance in the member's account except until following termination of membership, as provided in the bylaws.

93.     No other issuer is identified in the ***policies*** delivered to the Plaintiffs, and no other insurance company name or logo appears in those ***policies*** (as Defendants use the term "policy" in the automobile insurance contract).

94.     When the ***Declarations page*** is issued by one of the stock subsidiaries (instead of or in addition to USAA), that Declarations page identifies the name of that stock subsidiary. For example, Plaintiff Capps' Declarations page lists "USAA General Indemnity Company" (together with USAA) as an issuer of the ***Declarations page***:



Similarly, Plaintiff Persaud's Declarations page lists "Garrison Property and Casualty Insurance Company" (together with USAA) as an issuer of the ***Declarations page***:



95.     Likewise, when an ***endorsement*** is issued by one of the stock subsidiaries (instead of or in addition to USAA), that endorsement identifies the name of that stock subsidiary. For example, Plaintiff Persaud's automobile insurance contract specifies that the Accident Forgiveness Endorsement is issued, at least in part, by "Garrison Property and Casualty Insurance Company."



96.     The automobile insurance contracts entered into by the putative Breach of Contract Class members are the same or materially the same as those of Plaintiffs.

97.     Accordingly, Defendants entered into automobile insurance contracts with Plaintiffs and the Breach of Contract Class through which Defendants promised them: (a) membership in USAA together with the rights and obligations set forth in its bylaws; and (b) a share of the allocation of USAA's surplus, to the extent there is a surplus determined by USAA's Board of Directors.

98.     Defendants breached these contractual obligations by denying and withholding from Plaintiffs and the Breach of Contract Class: (a) membership in USAA; (b) participation in the distribution of USAA's excess surplus; (c) participation in the allocation of USAA's retained earnings; and (d) payment of that allocation six months after termination of membership.

99.     These rights and benefits are mandatory and not at the discretion of Defendants or the Board of Directors of USAA. While there may be years when, in good faith and subject to any applicable standards and requirements, USAA's Board of Directors determines there are no retained earnings and/or excess surplus, when (as has been the case for each of at least the past dozen years) the Board does in fact declare the existence of retained earnings and excess surplus, Plaintiffs and the Breach of Contract Class are contractually entitled to an allocation of those retained earnings (including termination distributions) and distributions of excess surplus in the form of the annual distribution and senior bonus.

100.     Plaintiffs and the putative Breach of Contract Class members, if Defendants had treated them as real members rather than nominal members, would have been eligible pursuant to applicable rules, policies, practices, and procedures to receive annual allocations of USAA's

retained earnings and participate in annual distributions, senior bonuses, and termination distributions on the same terms and in the same proportions as real members.

101.    Plaintiffs and the putative Breach of Contract Class members have performed all of their material obligations under their automobile insurance contracts or have been excused from any non-performance.

102.    As a result of the above breaches, Plaintiffs and the Breach of Contract Class have incurred actual damages in an amount to be proven at trial, including without limitation withheld annual distributions and allocations in each of the past 12 or more years. Plaintiffs, on behalf of themselves and the Breach of Contract Class, seek an order awarding them damages.

103.    Plaintiffs, on behalf of themselves and the Breach of Contract Class, also seek specific performance by Defendants of their contractual obligations described herein and seek such other relief to which they may be entitled.

**SECOND CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of the Breach of Contract Class)**

104.    Plaintiffs, on behalf of themselves and the Breach of Contract Class, re-allege and incorporate by reference all paragraphs above as if fully stated herein.

105.    This cause of action is pled in the alternative to Plaintiffs' First Cause of Action.

106.    A covenant of good faith and fair dealing is implied in the Plaintiffs' and the Breach of Contract Class's automobile insurance contracts with Defendants. This covenant imposes upon each party a duty of good faith and fair dealing in the performance of the contract.

107.    To the extent Plaintiffs' and the Breach of Contract Class's automobile insurance contracts with Defendants could be read as granting Defendants or any them any discretion with respect to whether to grant Plaintiffs and the Breach of Contract Class membership in USAA,

whether to provide them allocations of retained earnings, whether to provide them termination distributions, or whether to provide them annual distributions of excess surplus, including the senior bonus (none of which Plaintiffs concede), any such discretion is not unlimited. Instead, it is limited by the covenant of good faith and fair dealing.

108.    Defendants breached the covenant of good faith and fair dealing by its denial and withholding of rights and benefits as alleged herein, which conduct: was in bad faith; constituted an abuse of any contractual discretion Defendants had (if any) on these issues; defied the reasonable expectations of Plaintiffs and the Breach of Contract Class (including as such reasonable expectations were formed by USAA's own ubiquitous statements and promises about their entitlement to membership and membership benefits, as alleged herein); deprived Plaintiffs and the Breach of Contract Class of fundamental benefits of the contract they reasonably expected they would receive; and undermined a major purpose of the contracts.

109.    The relationship between Plaintiffs and the Breach of Contract Class, on the one hand, and Defendants, on the other hand, was a special relationship marked by shared trust and an imbalance in bargaining power, which obligates the parties to cooperate with each other so that each may obtain the full benefit of performance. Defendants breached that trust and obligations by their conduct alleged herein. Among other things, having led Plaintiffs and the Breach of Contract Class to believe that they would be real members and entitled to all benefits and rights of USAA membership, USAA proceeded to treat Plaintiffs and the Breach of Contract class less favorably as compared to real members whom USAA deemed more important or special than Plaintiffs and the Breach of Contract Class.

110.    Plaintiffs and the putative Breach of Contract Class members have performed all of their material obligations under their automobile insurance contracts or have been excused from any non-performance.

111.    As a result of the above breaches, Plaintiffs and the Breach of Contract Class have incurred actual damages in an amount to be proven at trial, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations of retained earnings in each of the past 12 or more years. Plaintiffs, on behalf of themselves and the Breach of Contract Class, seek an order awarding them damages.

112.    Plaintiffs, on behalf of themselves and the Breach of Contract Class, also seek specific performance by Defendants of their contractual obligations described herein and such other relief to which they may be entitled.

**THIRD CAUSE OF ACTION**
**Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1521 et seq.**
**(On Behalf of the Arizona Class)**

113.    Plaintiff Persaud and the members of the putative Arizona Class re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

114.    Arizona's Consumer Fraud Act prohibits the use of "any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact … in connection with the sale or advertisement of any" service. *See* Ariz. Rev. Stat. Ann. § 44-1522(A); *id.* § 44-1521(5) (defining "merchandise" to include any services).

115.    By engaging in the wrongful conduct set forth herein, which has occurred in connection with the advertisement and sale of insurance policies and services, Defendants have violated and continue to violate section 44-1522(A) of the Arizona Consumer Fraud Act.

Specifically, as alleged in this Complaint, Defendants have committed and continue to commit deceptive and unfair acts or practices by concealing, suppressing, or omitting material facts, including the fact that Plaintiff Persaud and the members of the putative Arizona Class are nominal (or associate) members that do not receive the economic benefits of real USAA membership, and failing to provide Plaintiff Persaud and the putative Arizona Class benefits of membership as alleged herein.

116.    As set forth herein, through Defendants' contracts and communications, Plaintiff Persaud and the members of the putative Arizona Class were all exposed to the same, uniform omissions of material information, including at the point of purchase, renewal, and on an ongoing, pervasive basis.

117.    Defendants have also violated and continue to violate section 44-1522(A) of the Arizona Consumer Fraud Act by failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

118.    Defendants' omissions relating to membership status were material because they were related and significant to the decision to purchase and renew insurance from Defendants considering the nature and circumstances of the transaction.

119.    At all relevant times, Defendants intended for consumers, including Plaintiff Persaud and the members of the putative Arizona Class, to rely on their unfair and deceptive acts and omissions, and such consumers did rely thereon.

120.    As a proximate result of Defendants' unfair and deceptive conduct, Plaintiff Persaud and the members of the putative Arizona Class suffered actual damages as set forth herein, including by failing to receive the economic benefits of real USAA membership, including without

limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

121.    Plaintiff Persaud, on behalf of himself and the members of the putative Arizona Class, seeks an order awarding them actual damages in an amount to be proven at trial and such other relief to which they may be entitled.

122.    Defendants' conduct described herein was wanton or reckless, showed spite or ill will, and/or demonstrated Defendants' reckless indifference to the interests of others. Therefore, Plaintiff Persaud, on behalf of himself and the members of the putative Arizona Class, also seeks an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Violation of the Arizona Unfair Insurance Practices Act,**
**Ariz. Rev. Stat. Ann. § 20-441 et seq.**
**(On Behalf of the Arizona Class)**

123.    Plaintiff Persaud and the members of the putative Arizona Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

124.    Arizona's Unfair Insurance Practices Act prohibits misrepresentations and false or misleading statements concerning the sale or advertisement of an insurance policy, including misrepresenting the "the terms of any policy issued or to be issued or the benefits or advantages promised or the dividends or share of the surplus to be received." *See* Ariz. Rev. Stat. Ann. § 20-443(A).

125.    Defendants' conduct alleged in this Complaint constituted deceptive and misleading statements and omissions about Plaintiff Persaud's and the members of the putative Arizona Class's status as nominal (or associate) members, the nature of their relationship with USAA, the benefits or advantages promised, and/or the surplus and excess surplus to be received, in violation of 20-443 of Arizona's Unfair Insurance Practices Act.

50

126.   Defendants have also violated Arizona's Unfair Insurance Practices Act by failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

127.   As set forth herein, through Defendants' contracts and communications, Plaintiff Persaud and the members of the putative Arizona Class were all exposed to the same, uniform misrepresentations and/or omissions of material information relating to their membership status, share of surplus, and benefits on an ongoing, pervasive basis.

128.   Defendants' misrepresentations and omissions relating to membership status, share of surplus, and benefits were material because they were related and significant to the decision to purchase and renew insurance from Defendants considering the nature and circumstances of the transaction.

129.   At all relevant times, Defendants intended for consumers, including Plaintiff Persaud and the members of the putative Arizona Class, to rely on their unfair and deceptive acts and misrepresentations and/or omissions, and such consumers did rely thereon.

130.   As a proximate result of Defendants' unfair and deceptive conduct, Plaintiff Persaud and the members of the putative Arizona Class suffered actual damages as set forth herein, including by failing to receive the economic benefits of full USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

131.   Plaintiff Persaud, on behalf of himself and the members of the putative Arizona Class, seeks an order awarding them actual damages in an amount to be proven at trial and such other relief to which they may be entitled.

51

132.     Defendants' conduct described herein was wanton or reckless, showed spite or ill will, and/or demonstrated Defendants' reckless indifference to the interests of others. Therefore, Plaintiff Persaud, on behalf of himself and the members of the putative Arizona Class, also seeks an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*)**
**(On Behalf of the California Class)**

133.     Plaintiff Guerrero and the members of the putative California Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

134.     Defendants' conduct alleged herein violates the "unfair," "fraudulent," and "unlawful" prongs of California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code §§ 17200, *et seq.*

135.     By their conduct alleged herein, Defendants have violated the "unfair" prong of the UCL, including without limitation by:

   a.   Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for real USAA membership status to Plaintiff Guerrero and the California Class, whom USAA knew were only eligible for nominal (or associate) membership status, and then depriving Plaintiff Guerrero and the other members of the California Class the benefits of USAA membership;

   b.   Issuing Plaintiff Guerrero and the California Class Members USAA member numbers;

   c.   Designing insurance policies in a way that creates and/or reinforces consumers' belief they are real USAA members when Defendants know they are nominal members and will not receive the benefits of membership; and

52

    d.   Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

136.   Defendants' conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff Guerrero and the California Class. By their conduct alleged herein, Defendants have already improperly denied Plaintiff Guerrero and the California Class money and other valuable benefits in which such persons have a vested interest, including the economic benefits of real USAA membership. There is no utility to Defendants' conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by Defendants' conduct alleged herein.

137.   Defendants' conduct alleged herein also violates California public policy, including as such policy is reflected in Cal. Civ. Code § 1750, *et seq.*, Cal. Civ. Code §§ 1709-1710, and California common law relating to contracts.

138.   By their conduct alleged herein, Defendants have also violated the "unlawful" prong of the UCL, including by breaching contractual promises in violation of California common law.

139.   By their conduct alleged herein, Defendants have violated the "fraudulent" prong of the UCL, including without limitation by:

    a.   Concealing, failing to disclose, and/or misrepresenting material information in communications with Plaintiff Guerrero and the California Class, including regarding their membership status and benefits;

    b.   Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for real USAA membership status to Plaintiff Guerrero and the California Class, whom USAA knew were only eligible for nominal (or associate)

membership status, and then depriving Plaintiff Guerrero and the other members of the California Class the benefits of USAA membership;

c.  Distributing communications containing intentionally confusing language indicating that those who are only eligible for nominal (or associate) membership status are real USAA members and will receive the benefits of membership;

d.  Issuing Plaintiff Guerrero and the California Class USAA member numbers;

e.  Designing insurance policies in a way that creates and/or reinforces consumers' belief they are real USAA members that will receive the benefits of membership when Defendants know they are nominal members and will not receive the benefits of membership; and

f.  Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

140.    With respect to concealment/omissions, Defendants at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Defendants had exclusive knowledge of material information that was not known and not reasonably available to Plaintiff Guerrero and the California Class; (b) Defendants concealed material information from Plaintiff Guerrero and the California Class; and (c) Defendants made partial representations, including regarding supposed "membership," which were false and misleading absent the omitted information.

141.    Defendants' material misrepresentations and nondisclosures were likely to mislead reasonable consumers and the public.

142.    Defendants' misrepresentations and nondisclosures deceive and have a tendency to deceive the general public and reasonable consumers.

54

143.    Defendants' misrepresentations and nondisclosures are material, such that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

144.    Plaintiff Guerrero and the members of the proposed California Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures, which impacted their purchase, renewal, and insurance decisions. Had they known the truth, they would have acted differently and/or would have been willing to pay less for their insurance.

145.    As a result of Defendants' conduct alleged herein, Plaintiff Guerrero and the California Class paid more money and were denied money and other benefits that they had a vested interest in, including the benefits of real USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years. Such money and benefits are subject to restitution.

146.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent conduct, Plaintiff Guerrero and the proposed California Class lost money, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

147.    Defendants' conduct has caused substantial injury to Plaintiff Guerrero, putative California Class members, and the public. Defendants' conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff Guerrero seeks an order enjoining Defendants from committing such unlawful, unfair, and fraudulent business practices.  Plaintiff Guerrero further seeks an order granting restitution to himself and the California Class in an

amount to be proven at trial. Plaintiff Guerrero further seeks an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

148.    Plaintiff Guerrero and the California Class lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action and to obtain or fully obtain the requested injunctive relief pursuant to this cause of action.

**SIXTH CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud Act**
**(On Behalf of the Illinois Class)**

149.    Plaintiff Ramos and the members of the putative Illinois Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

150.    The Illinois Consumer Fraud Act prohibits the use of "unfair and deceptive acts or practices" in the advertising, offering, selling, or distribution of any services. *See* 815 Ill. Comp. Stat. Ann. 505/2; *id.* § 1(f).

151.    Plaintiff Ramos and the members of the putative Illinois Class are persons and consumers under the Illinois Consumer Fraud Act. *See* 815 Ill. Comp. Stat. Ann. 505/1(c); *id.* § 1(e). Plaintiff Ramos and the members of the putative Illinois Class purchased insurance from Defendants in Illinois.

152.    As set forth herein, Defendants have committed and continue to commit numerous unfair and deceptive business acts and practices, including, but not limited to:

    a.    Concealing, failing to disclose, and/or misrepresenting material information in communications with Plaintiff Ramos and the Illinois Class, including regarding their membership status and benefits;

    b.    Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for real USAA membership status to Plaintiff Ramos and the Illinois Class, whom USAA knew were only eligible for nominal (or associate)

membership status and then depriving Plaintiff Ramos and the other members of the Illinois Class the benefits of USAA membership;

c.  Distributing communications containing intentionally confusing language indicating that those who are only eligible for nominal (or associate) membership status are real USAA members and will receive the benefits of membership;

d.  Issuing Plaintiff Ramos and the Illinois Class USAA member numbers;

e.  Designing insurance policies in a way that creates and/or reinforces consumers' belief they are real USAA members that will receive the benefits of membership when Defendants know they are nominal members and will not receive the benefits of membership; and

f.  Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

153.  Defendants' business practices set forth herein constitute unfair practices because:

a.  They offend the public policy of prohibiting the misrepresentation of policy terms and an insurance policy's benefits and advantages, *see* 215 Ill. Comp. Stat. Ann. 5/149;

b.  They are immoral, unethical, oppressive, and/or unscrupulous, given that they leave consumers with little to no alternative except to submit to being relegated to associate membership status; and/or

c.   They cause substantial injury to consumers that is not outweighed by any of the business practices' countervailing benefits to consumers or competition, and consumers could not have reasonably avoided the injury because Defendants prevented from anticipating the injury and/or unjustifiably hampered consumers'

57

ability to make free market decisions by concealing and/or misrepresenting material facts.

154.    At all relevant times, Defendants were aware that the information about membership status and benefits that Defendants concealed, failed to disclose, and/or misrepresented was material and the type of information on which a consumer would rely when deciding to purchase and renew insurance from Defendants.

155.    Plaintiff Ramos and the members of the proposed Illinois Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures.

156.    At all relevant times, Defendants intended for consumers, including Plaintiff Ramos and the members of the putative Illinois Class, to rely on their unfair acts and deception, which occurred in a course of conduct involving trade and/or commerce, and such consumers did rely thereon.

157.    At all relevant times, Defendants had actual knowledge that the information about USAA membership and benefits that they communicated to those only eligible for nominal membership status was false, misleading, and/or deceptive.

158.    As set forth herein, Defendants employed the same unfair and deceptive business practices with respect to Plaintiff Ramos and the members of the putative Illinois Class.

159.    As a direct and proximate result of Defendants' unfair and deceptive conduct, Plaintiff Ramos and the members of the putative Illinois Class suffered actual damages as set forth herein, including by failing to receive the economic benefits of real USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

160.    Plaintiff Ramos, on behalf of himself and the members of the putative Illinois Class, seeks an order awarding them actual damages, attorneys' fees, and costs; an order enjoining Defendants from engaging in the misconduct alleged herein in the future; and such other orders and judgments that may be necessary. *See* 815 Ill. Comp. Stat. Ann. 505/10a.

161.    Plaintiff Ramos, on behalf of himself and the and the members of the putative Illinois Class, also seeks an award of punitive damages to the extent warranted by Defendants' conduct described herein.

**SEVENTH CAUSE OF ACTION**
**Violation of New Jersey's Consumer Fraud Act,**
**N.J. Stat. Ann. § 56:8-1 *et seq.***
**(On Behalf of the New Jersey Class)**

162.    Plaintiff Miguel Galarza and the members of the putative New Jersey Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

163.    New Jersey's Consumer Fraud Act ("CFA") prohibits the use by any person of "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

164.    Plaintiff Galarza and the members of the putative New Jersey Class, and Defendants are all "persons" under New Jersey's CFA.

165.    At all relevant times herein, Defendants were engaged in the "sale" and "advertisement" of "merchandise" under New Jersey's CFA through their marketing and sale of insurance and insurance products to consumers.

166.   As set forth herein, Defendants have engaged in unlawful conduct under the CFA by:

a.   Concealing, failing to disclose, and/or misrepresenting material information in communications with Plaintiff Galarza and the New Jersey Class, including regarding their membership status and benefits;

b.   Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for real USAA membership status to Plaintiff Galarza and the New Jersey Class, whom USAA knew were only eligible for nominal (or associate) membership status, and then depriving Plaintiff Galarza and the other members of the New Jersey Class the benefits of USAA membership;

c.   Distributing communications containing intentionally confusing language indicating that those who are only eligible for nominal (or associate) membership status are real USAA members and will receive the benefits of membership;

d.   Issuing Plaintiff Galarza and the New Jersey Class USAA member numbers;

e.   Designing insurance policies in a way that creates and/or reinforces consumers' belief they are real USAA members that will receive the benefits of membership when Defendants know they are nominal members and will not receive the benefits of membership; and

f.   Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

167.   Plaintiff Galarza and the members of the proposed New Jersey Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures.

168.    At all relevant times, Defendants were aware that the information about membership status and benefits that Defendants concealed, suppressed, failed to disclose, and/or misrepresented was material and the type of information on which a consumer would rely when deciding to purchase and renew insurance from Defendants.

169.    At all relevant times, Defendants had actual knowledge that the information about USAA membership and benefits that they communicated to those only eligible for nominal membership status was false, misleading, and/or deceptive.

170.    At all relevant times, Defendants intended for consumers, including Plaintiff Galarza and the members of the putative New Jersey Class, to rely on their material misrepresentations, concealments, suppressions, and/or omissions, which occurred in connection with Defendants' sale and advertisement of insurance to consumers, and such consumers did rely thereon.

171.    Defendants' material misrepresentations, omissions, and/or nondisclosures impacted Plaintiff Galarza's and the members of the putative New Jersey Class's purchase, renewal, and insurance decisions. Had they known the truth, they would have acted differently and/or would have been willing to pay less for insurance with Defendants.

172.    As a direct and proximate result of Defendants' unlawful conduct under the CFA, Plaintiff Galarza and the members of the putative New Jersey Class have suffered ascertainable economic losses as set forth herein in amount to be determined at trial. Among others, these losses included paying more money and being denied money and other benefits they had a vested interest in, including the economic benefits of real USAA membership, including without limitation withheld annual distributions, senior distributions, termination distributions, and allocations in each of the past 12 or more years. Without Defendants' unlawful conduct under the CFA, Plaintiff

Galarza and the members of the putative New Jersey Class would not have sustained their ascertainable economic losses.

173.    Plaintiff Galarza, on behalf of himself and the members of the putative New Jersey Class, seeks an order awarding them actual damages, threefold actual damages, attorneys' fees, and costs, an order enjoining Defendants from engaging in the misconduct alleged herein in the future, and such other orders and judgments that may be necessary. *See* N.J. Stat. Ann. § 56:8-19.

### EIGHTH CAUSE OF ACTION
### Violation of the Texas Deceptive Trade Practices Act
### (On Behalf of the Texas Class)

174.    Plaintiffs Brian Lynn Capps and Christopher Gutierrez and the members of the putative Texas Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

175.    The Texas Deceptive Trade Practices Act ("DTPA") prohibits businesses, including Defendants which are headquartered in Texas, from engaging in deceptive acts or practices, including false, misleading, or deceptive business practices, unconscionable actions, and violations of the insurance code in the conduct of any trade or commerce. Tex. Bus. & Comm Code § 17.50(a)(1), (3) and (4); see also 17.44 to 17.63.

176.    Plaintiffs Capps and Gutierrez and the members of the putative Texas Class are consumers under the DTPA.

177.    As set forth herein, Defendants have committed and continue to commit numerous false, misleading, and deceptive and unconscionable business acts and practices, including, but not limited to:

    a.  Concealing, failing to disclose, and/or misrepresenting material information in communications with Plaintiffs Capps and Gutierrez and the Texas Class, including regarding their membership status and benefits;

b.  Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for real USAA membership status to Plaintiffs Capps and Gutierrez and the Texas Class, whom USAA knew were only eligible for nominal (or associate) membership status, and then depriving Plaintiffs Capps and Gutierrez and the other members of the Texas Class the benefits of USAA membership;

c.  Distributing communications containing intentionally confusing language indicating that those who are only eligible for nominal (or associate) membership status are real USAA members and will receive the benefits of membership;

d.  Issuing Plaintiffs Capps and Gutierrez and the Texas Class USAA member numbers;

e.  Designing insurance policies in a way that creates and/or reinforces consumers' belief they are real USAA members that will receive the benefits of membership when Defendants know they are nominal members and will not receive the benefits of membership; and

f.  Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

178.  These constitute actions proscribed under Tex. Bus. & Comm. Code § 17.50(a)(1) and as specifically enumerated under Tex. Bus. & Comm. Code § 17.46(b), including but not limited to:

a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status affiliation, or connection which the person does not;

b.  Representing that an agreement confers or involves the rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

c.  Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

179.    Plaintiffs Capps and Gutierrez and the members of the proposed Texas Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures.

180.    Plaintiffs Capps and Gutierrez and the members of the putative Texas Class relied upon Defendants' false, misleading and deceptive statements, claims, and representations and omissions regarding membership in USAA in choosing and continuing to utilize USAA for their insurance needs.

181.    These acts constitute unconscionable actions under Tex. Bus. & Comm. Code § 17.50(a)(3).

182.    These acts constitute unfair methods of competition and unfair or deceptive acts or practices prohibited actions under Tex. Bus. & Comm. Code § 17.50(a)(4) as enumerated in the Tex. Ins. Code § 541.003 et seq. Specifically, these acts violate the Tex. Ins. Code § 541.051(1)(b) by misrepresenting and making false and misleading statements regarding the terms, benefits, advantages promised, and/or the surplus and excess surplus to be received.

183.    At all relevant times, Defendants were aware that the information about membership status and benefits that Defendants concealed, failed to disclose, and/or

misrepresented was material and the type of information on which a consumer would rely when deciding to purchase and renew insurance from Defendants.

184.    At all relevant times, Defendants intended for consumers, including Plaintiffs Capps and Gutierrez and the members of the putative Texas Class, to rely on their unfair acts and deception, which occurred in a course of conduct involving trade and/or commerce, and such consumers did rely thereon.

185.    At all relevant times, Defendants had actual knowledge that the information about USAA membership and benefits that they communicated to those only eligible for nominal membership status was false, misleading, and/or deceptive.

186.    As set forth herein, Defendants employed the same false, misleading and deceptive business practices with respect to Plaintiffs Capps and Gutierrez and the members of the Texas Class.

187.    As a direct and proximate result of Defendants' conduct, Plaintiffs Capps and Gutierrez and the members of the putative Texas Class suffered actual damages as set forth herein, including by failing to receive the economic benefits of real USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

188.    Plaintiffs Capps and Gutierrez, on behalf of themselves and the members of the putative Texas Class, seek an order awarding them actual damages, attorneys' fees, and costs; treble damages, an order enjoining Defendants from engaging in the misconduct alleged herein in the future; and such other orders and judgments that may be necessary. Tex. Bus. & Comm. Code § 17.50(b).

189.    Pursuant to Texas Business & Commercial Code § 17.505, the Plaintiffs Capps and Gutierrez provided written notice to Defendants of their violations of the Texas Deceptive Trade Practices Act, along with specific descriptions of Plaintiffs Capps and Gutierrez's complaints and damages sought in a letter sent on May 8, 2024, and received on May 14, 2024. Plaintiffs have not received a response.

**NINTH CAUSE OF ACTION**
**Violation of Washington's Consumer Protection Act,**
**Wash. Rev. Code Ann. § 19.86.010 et seq.**
**(On Behalf of the Washington Class)**

190.    Plaintiff Eugene Horton and the members of the putative Washington Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

191.    Washington's Consumer Protection Act ("CPA") prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020.

192.    Plaintiff Horton and the members of the putative Washington Class are "persons" under Washington's CPA.

193.    At all relevant times herein, Defendants engaged in "trade" or "commerce" within the meaning of Washington's CPA.

194.    As set forth herein, Defendants have engaged in unfair and deceptive trade practices, including but not limited to:

a.    Concealing, failing to disclose, and/or misrepresenting material information in communications with associate members, including their status as associate members;

b.    Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for full USAA membership status to those USAA knew were

only eligible for associate membership status, and then depriving Plaintiff Horton and the other members of the Washington Class the benefits of USAA membership;

c.  Distributing communications containing intentionally confusing language indicating that those who are only eligible for associate membership status are full USAA members;

d.  Issuing associate members a USAA member number;

e.  Designing insurance policies in a way that creates and/or reinforces consumers' belief they are full USAA members because they have been issued a policy, are eligible for membership, and have been given a USAA membership number; and

f.  Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made.

195.   As set forth herein, Defendants have also engaged in unfair and deceptive trade practices by engaging in conduct in violation of Washington's insurance laws, including:

a.  By making representations and advertisements in the conduct of the business of insurance that Defendants knew were false, deceptive, and/or misleading in violation of Wash. Rev. Code Ann. § 48.30.040;

b.  By misrepresenting the terms of insurance policies, misrepresenting the benefits and advantages of insurance policies, and/or misrepresenting the dividends or share of surplus to be received on policies in violation of Wash. Rev. Code Ann. § 48.30.090; and

c.  Failing to provide benefits that Defendants were obligated to make and that Defendants promised and indicated would be made.

196. Defendants engaged in the unfair and deceptive conduct set forth herein to induce Washington consumers, including Plaintiff Horton, to purchase and renew Defendants' insurance policies.

197. Plaintiff Horton and the members of the proposed Washington Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures.

198. Defendants' unfair and deceptive conduct set forth herein affects the public interest in that Defendants' practices were injurious to the public interest because they injured other persons, had the capacity to injure other persons, and have the capacity to injure other persons. Defendants repeatedly engaged in the conduct described above in the course of conducting their business and made deceptive and/or misleading claims and communications to numerous Washington consumers including Plaintiff Horton and the members of the Washington Class.

199. At all relevant times herein, Defendants were in a superior bargaining position to Plaintiff Eugene and the members of the putative Washington Class.

200. Defendants' general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

201. Defendants' unfair and deceptive business practices set forth herein had and/or have the capacity to deceive and injure a substantial number of Washington consumers.

202. Defendants' unfair and deceptive business practices set forth herein are not outweighed by any countervailing benefits to consumers or competitors, and the harm caused by Defendants' conduct was not reasonably avoidable by consumers, including Plaintiff Horton and the Washington Class.

203.    Defendants' violations of Washington's insurance laws and unfair and deceptive business practices have directly and proximately caused Plaintiff Horton and the members of the putative Washington Class to suffer economic damages including by failing to receive the economic benefits of real USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years, in amount to be determined at trial.

204.    Due to Defendants' conduct, Plaintiff Horton and the members of the putative Washington Class seek an order awarding them actual damages, attorneys' fees, and costs and such other orders and judgments that may be necessary. In addition, Plaintiff Horton and the members of the putative Washington Class request that this Court use its discretion to increase the damages award for each putative member of the Washington Class by three times the actual damages sustained not to exceed $25,000 per member of the putative Washington Class. *See* Wash. Rev. Code Ann. § 19.86.090.

**TENTH CAUSE OF ACTION**
**Violation of New Mexico's Unfair Practices Act,**
**N.M. Stat. Ann. § 57-12-1 et seq.**
**(On Behalf of the New Mexico Class)**

205.    Plaintiff Kibler and the members of the putative New Mexico Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

206.    New Mexico's Unfair Practices Act ("UPA") prohibits the use of "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. Ann. § 57-12-3.

207.    Plaintiff Kibler and the members of the putative New Mexico Class are "persons" under New Mexico's UPA.

208.    At all relevant times herein, Defendants engaged in "trade" or "commerce" within the meaning of New Mexico's UPA.

209.    Among other things, New Mexico's UPA specifically prohibits "representing that … services have … characteristics … [or] benefits … that they do not have" and representing "that a person has a … status, affiliation or connection that the person does not have." N.M. Stat. Ann. § 57-12-2D(5).

210.    New Mexico's UPA also prohibits the use of "exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2D(14).

211.    As set forth herein, Defendants have engaged and continue to engage in unfair and deceptive trade practices under the UPA, including by knowingly and willfully:

   a.   Concealing, failing to disclose, and/or misrepresenting material information in communications with associate members, including their status as associate members;

   b.   Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for full USAA membership status to those USAA knew were only eligible for associate membership status and then depriving Plaintiff Kibler and the other members of the New Mexico Class the benefits of USAA membership;

   c.   Distributing communications containing intentionally confusing language indicating that those who are only eligible for associate membership status are full USAA members;

   d.   Issuing associate members a USAA member number;

e.   Designing insurance policies in a way that creates and/or reinforces consumers' belief they are full USAA members because they have been issued a policy, are eligible for membership, and have been given a USAA membership number; and

f.   Failing to provide benefits that Defendants were obligated to make and that Defendants promised and indicated would be made.

212.   As set forth herein, Defendants committed the above unfair and deceptive trade practices and made false and misleading statements and communications regarding USAA membership status and benefits as part of Defendants' regular course of business and in connection with Defendants' marketing and sale of their insurance contracts and services to those only eligible for nominal membership status.

213.   At all relevant times, Defendants had actual knowledge that the information about USAA membership and benefits that they communicated to those only eligible for nominal membership status was false, misleading, and/or deceptive.

214.   As detailed herein, Defendants committed the above unfair and deceptive trade practices knowingly and willfully. Defendants knew and/or should have known the statements and communications they made regarding USAA membership status and benefits to those only eligible for nominal membership status were false and/or misleading.

215.   Defendants' misrepresentations and nondisclosures deceive and have a tendency to deceive the general public and reasonable consumers. As detailed herein, Defendants' unfair and deceptive trade practices and the false and misleading statements and communications Defendants have made regarding membership status and benefits were the type of statements and conduct that tend to and actually did deceive and mislead consumers, including Plaintiff Kibler and the members of the New Mexico Class.

216.    Additionally, as detailed herein, Defendants committed unconscionable trade practices under New Mexico's UPA by exploiting insureds' lack of knowledge about only being eligible for nominal membership status to a grossly unfair degree and to the detriment of their insureds. Defendants, who at all relevant times were in a superior bargaining position, knowingly took advantage of Plaintiff Kibler and the members of the New Mexico Class by making misleading statements and communications regarding USAA membership and benefits and by failing to adequately disclose that they were not eligible for full USAA membership status.

217.    Plaintiff Kibler and the members of the proposed New Mexico Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures, which impacted their purchase, renewal, and insurance decisions. Had they known the truth, they would have acted differently and/or would have been willing to pay less for insurance with Defendants.

218.    As a result of Defendants' above unfair and deceptive trade practices and unconscionable trade practices, Plaintiff Kibler and the members of the New Mexico Class suffered economic damages as set forth herein, including by failing to receive the economic benefits of real USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

219.    Plaintiff Kibler and the members of the putative New Mexico Class seek an order awarding them actual damages in an amount to be proven at trial and such other relief to which they may be entitled.

## ELEVENTH CAUSE OF ACTION
### Violation of New Mexico's Unfair Insurance Practices Act,
### N.M. Stat. Ann. § 59A-16-1 et seq.
### (On Behalf of the New Mexico Class)

220.    Plaintiff Kibler and the members of the putative New Mexico Class re-allege and incorporate by reference paragraphs 1 to 197 as if fully set forth herein.

221.    New Mexico's Unfair Insurance Practices Act ("UIPA") prohibits insurers from misrepresenting to insureds "pertinent facts or policy provisions." *See* N.M. Stat. Ann. § 59A-16-20(A). Furthermore, under the UIPA, insurance companies must disclose all material facts about the insurance policies they sell. *Belanger v. Allstate Fire & Cas. Ins. Co.*, 588 F. Supp. 3d 1249, 1264 (D.N.M. 2022).

222.    As detailed herein, Defendants violated the UIPA by misrepresenting and/or concealing material facts regarding USAA membership status and benefits, failing to disclose to Plaintiff Kibler and the members of the New Mexico Class that they were not real USAA members or eligible for full USAA membership status, and/or failing to provide benefits that Defendants were obligated to make and that Defendants promised and indicated would be made.

223.    Plaintiff Kibler and the members of the proposed New Mexico Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures, which impacted their purchase, renewal, and insurance decisions. Had they known the truth, they would have acted differently and/or would have been willing to pay less for insurance with Defendants.

224.    As a result of Defendants' violations of the UIPA, Plaintiff Kibler and the members of the New Mexico Class suffered economic damages in an amount to be proven at trial, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

225.     Plaintiff Kibler and the members of the putative New Mexico Class seek an order awarding them actual damages in an amount to be proven at trial and such other relief to which they may be entitled.

**TWELFTH CAUSE OF ACTION**
**Violation of Nevada's Deceptive Trade Practices Act**
**Nev. Rev. Stat. Ann. § 598.0903 et seq.**
**(On Behalf of the Nevada Class)**

226.     Plaintiff Lindemier and the members of the putative Nevada Class re-allege and incorporate by reference all above paragraphs as if fully set forth herein.

227.     Nevada's Deceptive Trade Practices Act ("NDTPA") prohibits the use of false representations in the sale of goods and services, including false representations about the characteristics of goods and services. Nev. Rev. Stat. Ann. § 598.0915. The NDTPA also prohibits the failure to disclose material facts in connection with sale of goods or services and the use of unconscionable business practices, such as taking advantage of consumers' lack of knowledge to a grossly unfair degree. Nev. Rev. Stat. Ann. § 598.0923. Victims of deceptive trade practices may bring an action for damages and other relief. *See* Nev. Rev. Stat. Ann. § 41.600.

228.     At all relevant times herein, Defendants engaged in the sale of goods and/or services within the meaning of the NDTPA. As set forth herein, Defendants have engaged in unconscionable and deceptive trade practices, including, but not limited to:

   a.   Concealing, failing to disclose, and/or misrepresenting material information in communications with associate members, including their status as associate members;

   b.   Designing and marketing their insurance products and/or services in a manner that conveyed eligibility for full USAA membership status to those USAA knew were only eligible for associate membership status, and then depriving Plaintiff

Lindemier and the other members of the Nevada Class the benefits of USAA membership;

c. Distributing communications containing intentionally confusing language indicating that those who are only eligible for associate membership status are full USAA members;

d. Issuing associate members a USAA member number;

e. Designing insurance policies in a way that creates and/or reinforces consumers' belief they are full USAA members because they have been issued a policy, are eligible for membership, and have been given a USAA membership number;

f. Failing to make allocations and distributions that Defendants were obligated to make and that Defendants promised and indicated would be made;

g. Making representations and advertisements in the conduct of the business of insurance that Defendants knew were false, deceptive, and/or misleading; and/or

h. Misrepresenting the terms of insurance policies, misrepresenting the benefits and advantages of insurance policies, and/or misrepresenting the status and affiliation under insurance policies and the surplus to be received on policies.

229.    Defendants above conduct violates Nev. Rev. Stat. Ann. § 598.0915 subsections (2), (3), (5), (9), and (15) and/or Nev. Rev. Stat. Ann. § 598.0923 subsections (1)(b) and (1)(e).

230.    Defendants engaged in the unfair and deceptive conduct set forth herein to induce Nevada consumers, including Plaintiff Lindemier, to purchase and renew Defendants' insurance policies.

231.    Defendants committed the above unfair and deceptive trade practices and made false and misleading statements and communications regarding USAA membership status and

benefits as part of Defendants' regular course of business and in connection with Defendants' marketing and sale of their insurance contracts and services to those only eligible for nominal membership status. Defendants repeatedly engaged in the conduct described above in the course of conducting their business and made deceptive and/or misleading claims and communications to numerous Nevada consumers including Plaintiff Lindemier and the members of the Nevada Class.

232.    At all relevant times, Defendants had actual knowledge that the information about USAA membership and benefits that they communicated to those only eligible for nominal membership status was false, misleading, and/or deceptive.

233.    As detailed herein, Defendants committed the above unfair and deceptive trade practices knowingly and willfully. Defendants knew and/or should have known the statements and communications they made regarding USAA membership status and benefits to those only eligible for nominal membership status were false and/or misleading.

234.    Additionally, as detailed herein, Defendants committed unconscionable trade practices under the NDTPA by exploiting insureds' lack of knowledge about only being eligible for nominal membership status to a grossly unfair degree and to the detriment of their insureds. Defendants, who at all relevant times were in a superior bargaining position, knowingly took advantage of Plaintiff Lindemier and the members of the Nevada Class by making misleading statements and communications regarding USAA membership and benefits and by failing to adequately disclose that they were not eligible for full USAA membership status.

235.    Plaintiff Lindemier and the members of the proposed Nevada Class were exposed to (on an ongoing, pervasive basis) and reasonably relied on Defendants' material misrepresentations and nondisclosures, which impacted their purchase, renewal, and insurance

decisions. Had they known the truth, they would have acted differently and/or would have been willing to pay less for insurance with Defendants.

236.    As a result of Defendants' above unfair and deceptive trade practices and unconscionable trade practices, Plaintiff Lindemier and the members of the Nevada Class suffered economic damages as set forth herein, including by failing to receive the economic benefits of real USAA membership, including without limitation withheld annual distributions, senior bonuses, termination distributions, and allocations in each of the past 12 or more years.

237.    Plaintiff Lindemier and the members of the putative Nevada Class seek an order awarding them actual damages in an amount to be proven at trial and such other relief to which they may be entitled.

### PRAYER FOR RELIEF

238.    WHEREFORE, the Plaintiffs request the Court enter judgment in their favor and in favor of the members of the Classes, against the Defendants as follows:

a.    Finding this action satisfies the requirements for maintenance as class action under Federal Rule of Civil Procedure 23 and certifying the Classes defined herein;

b.    Designating Plaintiffs as representatives of the respective Classes and their counsel as class counsel to each;

c.    Declaring Defendants' practices described above to constitute breach of contract as to Plaintiffs and the Breach of Contract Class;

d.    Declaring Defendants' practices described above to constitute breach of the implied covenant of good faith and fair dealing as to Plaintiffs and the Breach of Contract Class;

e.  Declaring Defendants' practices described above to constitute violations of the Arizona, California, Illinois, Texas, Washington, New Jersey, New Mexico, and Nevada consumer protection and insurance statutes alleged herein;

f.  Ordering specific performance by Defendants of their contractual obligations as to Plaintiffs and the Breach of Contract Class;

g.  Permanently enjoining Defendants from engaging in the misconduct alleged herein;

h.  Granting equitable relief to the Plaintiffs and members of the Classes, including disgorgement of, restitution of, and/or imposing a constructive trust upon the ill-gotten gains derived by Defendants;

i.  Awarding the Plaintiffs and members of the Classes actual and compensatory damages;

j.  Awarding the Plaintiffs and members of the Classes punitive damages, exemplary damages, special damages, treble damages, and triple damages, as applicable;

k.  Awarding pre-judgment and post-judgment interest;

l.  Awarding reasonable attorney's fees and costs;

m.  Granting such further injunctive or other relief to which Plaintiffs and the Classes are entitled and as the Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated: September 13, 2024

Respectfully submitted,

*/s/ Sean Lyons*

Texas Bar No. 00792280
sean@lyonsandlyons.com
Lyons & Lyons, PC
237 W. Travis St. Suite #100
San Antonio, TX 78205
(210) 225-5251

Nimish R. Desai
Texas Bar No. 24105238
ndesai@lchb.com
Roger N. Heller
(*Pro hac vice*)
rheller@lchb.com
Michael Levin-Gesundheit
(*Pro hac vice*)
mlevin@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000

Jacob S. Miller
(*Pro hac vice*)
jmiller@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500

Michael J. Brickman
(*Pro hac vice*)
mbrickman@rpwb.com
James C. Bradley
(*Pro hac vice*)
jbradley@rpwb.com
Nina Fields Britt
(*Pro hac vice*)
nfields@rpwb.com
Caleb M. Hodge
(*Pro hac vice*)
chodge@rpwb.com
ROGERS, PATRICK, WESTBROOK &
BRICKMAN, LLC

1037 Chuck Dawley Blvd., Bldg. A (29464)
Post Office Box 1007
Mount Pleasant, SC 29465
Phone: (843) 727-6500

Michael P. Thornton
(*Pro hac vice* forthcoming)
mthornton@tenlaw.com
David J. McMorris
(*Pro hac vice* forthcoming)
dmcmorris@tenlaw.com

Christian Uehlein
(*Pro hac vice* forthcoming)
cuehlein@tenlaw.com
THORNTON LAW FIRM, LLP
84 State Street, 4th Floor
Boston, MA 02109
(617) 720-1333

*Counsel for Plaintiffs and the Proposed
Classes*